## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### (Alexandria Division)

|  |  |  |
|---|---|---|
| **ATTARD INDUSTRIES, INC.,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | **Case No: 1:10-cv-121** |
| *v.* | ) | |
| | ) | Judge Anthony J. Trenga |
| **UNITED STATES FIRE INSURANCE** | ) | |
| **COMPANY,** | ) | Magistrate Judge T. Rawles Jones, Jr. |
| | ) | |
| *Defendant.* | ) | |
| | ) | |

## DEFENDANT UNITED STATES FIRE INSURANCE COMPANY'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT AND/OR ALTERNATIVELY PARTIAL SUMMARY JUDGMENT

## TABLE OF CONTENTS

I.  STATEMENT OF UNDISPUTED FACTS ..................................................................1

II.  GOOD FAITH CONFERRAL CERTIFICATION ..........................................................12

III.  LEGAL STANDARD..........................................................................................12

IV.  ARGUMENT ...................................................................................................12

    A.  Attard Is Not Entitled to Compensation For Certain of Its Claims Under the Express Language of the Sub-subcontract........................................................................12

        1.  Attard's Claims for CN 489 and the Period 3 Delay are Not Ripe under Article 5.1 of the Sub-subcontract ..................................................................13

        2.  Attard's Period 3 Delay Claim is Barred by Article 4.1.9 ...............................14

        3.  Attard's Claim for Compensation for the Period 3 Delay Should be Dismissed because Attard was not Performing Work on the Project During the Compensable Period. .......................................................................................17

        4.  The Owner's Decision on Change Order Compensation Is Binding on Attard ..................................................................................................18

    B.  Attard Lacks Standing...........................................................................................24

    C.  Attard Fails to Comply with the Virginia Code.........................................................25

V.  CONCLUSION...................................................................................................27

# TABLE OF AUTHORITIES

## Statutes

Virginia Code § 49-25, *et seq.* (West 2010) ................................................................ 11, 25-26

## Rules and Regulations

Federal Rules of Civil Procedure, Rule 56 ........................................................................1

Local Civil Rule 56 ...........................................................................................................1

## Cases

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986) ...........................................12

*\*Blumenthal-Kahn Elec. Ltd. v. American Home Assur. Co.,*
236 F.Supp.2d 575 (E.D.Va. 2002). ...........................................................................13

*\*Board of Sup'rs of Fairfax County v. Southern Cross Coal Corp.,*
238 Va. 91, 380 S.E.2d 636 (1989)...............................................................................13

*Centex Construction v. Acstar Insurance, Co.,*
448 F.Supp.2d 697 (E.D.Va. 2006) .............................................................................13

*Cleveland v. Policy Mgmt. Sys. Corp.,*
526 U.S. 795, 119 S. Ct. 1597, 143 L. Ed. 2d 966 (1999) .........................................13

*D.C. McLain v. Arlington County,*
249 Va. 131, 452 S.E.2d 659 (1995) ...........................................................................13

*\*Dennis Stubbs Plumbing, Inc. v. Travelers Cas. & Sur. Co. of Am.,*
67 Fed. Appx. 789, 2003 WL 21305789, at *1  (4th Cir. 2003) .................................15

*Dowdy v. Franklin,*
203 Va. 7, 121 S.E.2d 817 (1961) ...........................................................................26-27

*Fairfax County Redevelopment and Housing Authority v. Worcester Brothers Co., Inc.,*
257 Va. 382, 514 S.E.2d 147 (1999) ...........................................................................18

*Lynchburg Traffic Bureau v. Norfolk and Western Railway Co.,*
207 Va. 107 (1966) .......................................................................................................24

*McDevitt & Street Co. v. Marriott Corp.,*
713 F. Supp. 906 (E.D. Va. 1989) ...............................................................................15

*Nigh v. Koons Buick Pontiac, GMC, Inc.,*
No. CIVA 00-1634-A, 2001 WL 35963875, at *4 (E.D.Va. Aug. 15, 2001) ......................... 24-25

*Nova Cas. Co. v. Liberty Mut. Ins. Co.,*
540 F. Supp. 2d 476 (S.D.N.Y 2008) ......................................................................................15

*U.S. ex. Rel. Joseph Shisko, Inc. v. Metric Constructions,*
Case No. 98-1042 1998 U.S. App. Lexis 31621, at *2 (4th Cir. 1998)...............................15

*\*U.S. ex. Rel. Zanahary Group, Inc. v. Systems Eng'g and Energy Mgmt. Assocs., Inc.,*
Case No. 2:98cv1431, 2000 U.S. Dist. Lexis 23003, at *1 (E.D.Va. 2000)....................16-17

*Viking Enterprise, Inc. v. County of Chesterfield,*
277 Va. 104, 670 S.E.2d 744 (2009) ................................................................................ 26-27

* Cases primarily relied upon.

COMES NOW, Defendant United States Fire Insurance Company ("USFIC"), by counsel, Seeger Faughnan Mendicino, P.C., and pursuant to Federal Rule of Civil Procedure 56 and Local Civil Rule 56, and in support of its Motion for Summary Judgment and/or Alternatively Partial Summary Judgment, states as follows:

## I.      STATEMENT OF UNDISPUTED FACTS

### A.      <u>Background Facts</u>

1.      Jett Mechanical, Inc. ("Jett") is a Virginia Corporation with its principal place of business located at 5706-A General Washington Drive, Alexandria, Virginia 22312.  (Ex. A, Affidavit of Robert Jett at ¶ 5).

2.      On December 16, 2002, Jett entered into a subcontract (the "Subcontract") with Turner Construction, Inc. ("Turner"), to provide all mechanical and plumbing work on a construction project at the Washington Dulles International Airport known as the Dulles Airport Package 6 Main Terminal People Mover Station (the "Project"). (Doc. No. 1 at ¶ 5).

3.      The owner of the Project was the Metropolitan Washington Airport Authority ("MWAA" or "Owner").  (Ex. A at ¶ 8).

4.      On January 21, 2003, Jett entered into a sub-subcontract with Attard Industries, Inc. ("Attard") to provide labor and materials on the Project (the "Sub-subcontract").  (Doc. No. 1 at ¶¶ 7, 8, and 12; Ex. A-2, Sub-subcontract).

5.      USFIC, as surety, issued payment bonds on behalf of Jett, as principal, in connection with the Project (the "Bonds"). (Doc. No. 1 at ¶¶ 9-10).

6.      On or about May 12, 2004, USFIC issued Payment Bond No. 6102441216 on behalf of Jett, as principal, and in favor of Turner, as obligee, in connection with Phase I of the Project. (Doc. No. 1 at ¶ 9).

7.      On or about December 29, 2004, USFIC issued Payment Bond No. 6102454176 on behalf of Jett, as principal, and in favor of Turner, as obligee, in connection with Phase II of the Project. (Doc. No. 1 at ¶ 10).

8.      By letter dated June 5, 2008, Jett, through its attorneys, advised Attard that it was in material breach of the Sub-subcontract and, despite repeated and longstanding demands that Attard cure such breaches, it had failed to do so. (Ex. A-4, June 5 2008 Letter).

9.      The enumerated breaches included:

a.      Attard's failure to provide adequate qualified manpower and equipment to progress the work in accordance with the Project completion date;

b.      Attard's failure to provide experienced qualified supervision;

c.      Attard's failure to identify amounts owed to all subcontractors and suppliers who provided labor and materials to Attard on the Project;

d.      Attard's failure to timely provide pricing of outstanding change orders;

e.      Attard's failure to adequately protect ductwork from dust and damage;

f.      Attard's unsafe work practices; and

g.      Attard's failure to conform billings to coincide with the actual percentages with the work completed.

(Ex. A-4).

10.     Also in the June 5, 2008 letter, Jett advised Attard that if it did not cure its default within seven (7) days, Jett would terminate Attard's Subcontract for default, complete Attard's Sub-subcontract work and back charge Attard for the costs incurred by Jett in completing such work in excess of the Sub-subcontract price. (Ex. A-4).

11.     By letter dated June 20, 2008, Jett, through its attorneys, advised Attard that it had failed to cure its defaults, that its Sub-subcontract was terminated and that Jett was reserving its

right to hold Attard responsible for all costs incurred by Jett in completing Attard's Sub-subcontract work in excess of the Sub-subcontract price. (Ex.A-5, June 20, 2008 Letter).

12.      Thereafter, on October 22, 2009, Attard, submitted a "Proof of Claim and Affidavit of Laborer, Materialman or Subcontractor" to USFIC claiming it was owed the sum of $5,795,752 for the material and/or labor it provided to the Project. (Ex. A-6, Proof of Claim Form).

13.      On February 12, 2010, Attard filed its Complaint in this matter, seeking recovery from USFIC under the terms of the Bonds. (Doc. No. 1).

14.      Attard seeks $6,116,331 "for the outstanding amount due for work performed and material supplied to the Project." (Doc. No. 1 at ¶ 17).

15.      Specifically, Attard has itemized its damages as follows:

| Invoice No. | Invoice Date | Amount Due | DC No. | CN No. | PCO No. |
|---|---|---|---|---|---|

Base Contract Work

| Invoice No. | Invoice Date | Amount Due | DC No. | CN No. | PCO No. |
|---|---|---|---|---|---|
| 02/19/08/SOV6 | 19-Feb-08 | $57,850 | n/a | n/a | n/a |
| 04/21/08/SOV6 | 21-Apr-08 | $52,540 | n/a | n/a | n/a |
| 05/16/08/SOV6 | 16-May-08 | $76,010 | n/a | n/a | n/a |
| 06/20/08/SOV6 | 20-Jun-08 | $134,179 | n/a | n/a | n/a |
|  | Subtotal: | $320,579 |  |  |  |

Changed Work

| Invoice No. | Invoice Date | Amount Due | DC No. | CN No. | PCO No. |
|---|---|---|---|---|---|
| 10/19/04/PCO1139 | 19-Oct-04 | $602 | n/a | 329 | 1139 |
| 4/19/05/PCO1217 | 19-Apr-05 | $71 | n/a | n/a | 1217 |
| 8/18/05/PCO1039 | 18-Aug-05 | $5,512 | 53 | 261 | 1039 |
| 10/19/05/PCO1328 | 19-Oct-05 | $2,010 | 74 | 444 | 1328 |
| 1/19/06/PCO1424 | 19-Jan-06 | $11,435 | n/a | 498 | 1424 |
| 3/17/06/PCO992 | 17-Mar-06 | $5,000 | n/a | 299 | 992 |
| 3/17/06/PCO1345 | 17-Mar-06 | $3,961 | 73 | 463 | 1345 |
| 5/19/06/PCO772 | 19-May-06 | $17,885 | n/a | 174 | 772 |
| 7/20/06/PCO1566 | 20-Jul-06 | $38,233 | n/a | 605 | 1566 |
| 7/20/06/PCO1345 | 20-Jul-06 | $2,231 | 73 | 463 | 1345 |

| | | | | | |
|---|---|---|---|---|---|
| 8/18/06/PCO1568 | 18-Aug-06 | $36,483 | n/a | 594 | 1568 |
| 8/15/06/PCO1566 | 15-Aug-06 | $2,424 | n/a | 605 | 1566 |
| 9/26/09/PCO1572 | 26-Sep-06 | $1,993 | n/a | n/a | 1572 |
| 9/26/06/PCO1566 | 26-Sep-06 | $1,651 | n/a | 605 | 1566 |
| 10/20/06/PCO1316 | 20-Oct-06 | $94,445 | n/a | 777 | 1761 |
| 11/30/06/PCO1165 | 30-Nov-06 | $258,500 | 9 | 371 | 1165 |
| 12/01/06/PCO1529 | 1-Dec-06 | $5,516 | n/a | 565 | 1529 |
| 1/08/07/PCO1654 | 8-Jan-07 | $6,335 | n/a | 640 | 1654 |
| 1/20/07/PCO1345 | 20-Jan-07 | $52,887 | 73 | 463 | 1345 |
| 1/22/07/PCO843 | 22-Jan-07 | $1,674 | 32 | 173 | 843 |
| 1/22/07/PCO1345 | 22-Jan-07 | $1,115 | 73 | 463 | 1345 |
| 4/19/07/PCO1286 | 19-Apr-07 | $23,100 | n/a | 417 | 1286 |
| 4/19/07/PCO1243 | 19-Apr-07 | $8,070 | n/a | 401 | 1243 |
| 4/19/07/PCO1470 | 19-Apr-07 | $6,262 | n/a | 530 | 1470 |
| 7/23/07/PCO1682 | 23-Jul-07 | $6,454 | UP90 | n/a | 1682 |
| 7/20/07/PCO1713 | 20-Jul-07 | $21,200 | n/a | 656 | 1713 |
| 7/20/07/PCO1609 | 20-Jan-07 | $2,886 | n/a | 611 | 1609 |
| 8/10/07/PCO1903 | 10-Aug-07 | $1,978 | n/a | 751 | 1903 |
| 8/10/07/PCO1878 | 10-Aug-07 | $2,328 | n/a | 743 | 1878 |
| 8/10/07/PCO1848 | 10-Aug-07 | $12,875 | n/a | 717 | 1848 |
| 8/10/07/PCO1805 | 10-Aug-07 | $6,461 | n/a | 719 | 1805 |
| 1/19/08/PCO2123 | 19-Jan-08 | $58,272 | n/a | 869 | 2123 |
| 1/19/08/PCO1953 | 19-Jan-08 | $26,671 | n/a | 788 | 1953 |
| 1/21/08/PCO2123 | 21-Jan-08 | $11,695 | n/a | 863 | 2118 |
| 1/21/08/PCO2060 | 21-Jan-08 | $28,578 | n/a | 841 | 2060 |
| 1/18/08/PCO2067 | 18-Jan-08 | $71,509 | n/a | 839 | 2067 |
| 4/11/08/PCO1149 | 11-Apr-08 | $1,667,485 | n/a | 331 | 1149 |
| 5/27/08/PCO2322 | 27-May-08 | $17,859 | n/a | UP136 | 2344 |
| 5/31/08/PCO2021 | 31-May-08 | $44,412 | n/a | 818 | 2021 |
| 6/3/08/PCO2344 | 3-Jun-08 | $30,530 | n/a | UP136 | 2344 |
| 6/13/08/PCO2306 | 13-Jun-08 | $1,871 | n/a | 972 | 2306 |
| 6/16/08/PCO2370 | 16-Jun-08 | $18,677 | n/a | 997 | 2370 |
| 6/21/08/PCO2291 | 21-Jun-08 | $35,000 | n/a | 962 | 2291 |
| 6/21/08/PCO2108 | 21-Jun-08 | $75,000 | n/a | 380 | 2108 |
| 6/21/08/PCO2415 | 21-Jun-08 | $15,000 | n/a | 1030 | 2415 |
| 6/25/08/PCOSDRWK | 25-Jun-08 | $15,203 | n/a | n/a | n/a |
| 7/02/08/CN489 | 2-Jul-08 | $914,698 | n/a | 489 | 1316 |
| 7/02/08/P1839 | 2-Jul-08 | $345,822 | n/a | 711 | 1839 |
| 9/26/08/RENT | 26-Sep-08 | $42,858 | n/a | n/a | n/a |
| 10/01/09/PHASE 3 | 14-Oct-09 | $1,733,035 | n/a | | |
| | Subtotal: | $5,795,752 | | | |

Amount Due for Base Contract Work:          $320,579

Amount Due for Changed Work:                $5,795,752

4

TOTAL:          $6,116,331

(Ex. C-1, Attard's Supplemental Answers to USFIC's 1st Set of Interrogatories, at 2-3).

16.      Trial in this case is set to begin on August 23, 2010. (Doc. No. 63).

**B.      Delay Claims**

17.      The original substantial completion deadline for the Project was July 27, 2007.
(Ex. A at ¶ 26).

18.      The original substantial completion deadline has been extended two times by the
Owner. (Ex. 1 at ¶ 27).

19.      The first extension of the substantial completion deadline is known as the "Period
1 Extension."   By change order, the Owner extended the original substantial completion
deadline from July 27, 2007 to December 17, 2007. (Ex. A at ¶ 28; Ex. B-1, McManus Dep. Tr.
88-95).

20.      The second extension of the substantial completion deadline is known as the
"Period 2 Extension."  By change order, the Owner extended the substantial completion deadline
from December 17, 2007 to approximately July 2008.  (Ex. A at ¶ 29; Ex. B-1, McManus Dep.
Tr. 90:5-2, 93:2-8).

21.      A third delay period, known as the "Period 3 Delay," is still in negotiation with
the Owner.   The contractors on the Project, including Jett, are seeking compensation for
additional costs associated with the delay of substantial completion of the Project from
approximately July 2008 through approximately September 2009. (Ex. A at ¶ 30; Ex. B-1,
McManus Dep. Tr. 91:4-11, 93:9-22, 94:1-17).

22.      As part of its damages, Attard seeks recovery of approximately $1,733,035 for the
Period 3 Delay, despite the fact that it was terminated before the July 2008 substantial

5

completion date associated with the Period 2 Extension, and thus, did not incur <u>any</u> costs after the Period 2 substantial completion date. (Ex. C-1 at 3).

23.     As of the date of filing this Motion, the Owner has not executed a change order either extending the substantial completion date beyond the Period 2 Extension or recognizing a right to payment for the Period 3 Delay, nor has the Owner issued any payments associated with the Period 3 Delay. (Ex. A at ¶ 31).

24.     Article 4.1.9 of the Sub-subcontract governs Attard's right to payment on delay claims. Article 4.1.9 provides:

> Subcontractor [Jett] shall not be liable to the Sub-Subcontractor [Attard] for any damage or additional compensation as a consequence of delays, including, but not limited to, unabsorbed or under-absorbed overhead, extended field and home office overhead, and labor and material escalation, caused by any person unless, as a condition precedent, the Subcontractor has first recovered same from the party responsible for the delays. <u>Sub-subcontractor understands and agrees that apart from any recovery from the delaying party, the Sub-subcontractor's sole and exclusive remedy for the delay shall be an extension in the time for performance of the Sub-Subcontractor's work.</u>

(Ex. A-2, Article 4.1.9; emphasis added).

25.     Article 5.1 of the Sub-subcontract also governs Attard's right to payment on claims. Article 5.1 provides in part:

> If Sub-subcontractor shall make any claim for additional compensation and/or time for Owner directed changes in the Work, or any other damages for any cause arising out of or relating to problems caused by or which are the responsibility of the Owner, <u>a decision of [sic] Owner or Owner's authorized representative shall be final and binding upon Sub-subcontractor to the same extent it is final and binding on Subcontractor.</u>

(Ex. A-2, Article 5.1; emphasis added).

**C.     <u>Change Orders</u>**

26.     The Subcontract between Jett and Turner contains binding obligations that apply to Attard's claims.  Pursuant to the terms of the Sub-subcontract, Attard agreed that the

6

Subcontract was "as fully a part of the Sub-subcontract as if attached to this [Sub-subcontract] or repeated [therein]." (Ex. A-2, Article 1.1). Further, Attard agreed to "assume toward [Jett] all obligations and responsibilities which and responsibilities which [Jett] assumes toward the Contractor, Owner and the Architect ..." and that Jett "shall have the benefit of all rights, remedies and redress against the Sub-subcontractor which the Contractor or Owner...has against [Jett]." (*Id.*).

27.     Article V of the Subcontract limits recovery for claims for obstruction, hinderance or interference to the Work to solely such claims for which "Turner has actually recovered corresponding cost reimbursement, compensation or damages from the Owner under the Contract Documents for such delay, obstruction, hindrance or interference, and then only to the extent of the amount, if any, which Turner on behalf of the Subcontractor, actually received from the Owner..." (Ex. A-1, the Subcontract at Article V). Moreover, the Subcontract also stated that "it shall be an express condition precedent to any obligation on the part of Turner to make payment of any such cost reimbursement, compensation or damages to the Subcontractor hereunder that Turner shall first be determined to be entitled to such compensation on behalf of the Subcontractor and then receive such payment from Owner..." (*Id.*).

28.     Article 5.1 of the Sub-subcontract provides, in pertinent part, "The Owner may make changes in the Work by issuing Modifications to the Prime Contract." (Ex. A-2, Article 5.1).

29.     Article 5.1 further provides that if the Owner makes changes in the work, Attard may make a claim for additional compensation in relation to Owner directed changes, and any decision by the Owner is final and binding on Attard to the extent it is binding on Jett. (Ex. A-2, Article 5.1).

7

30.     CN 489 is a proposed change order for re-sequencing of work directed by the Owner.  This CN is intended to compensate contractors on Package 6 for the interference with and impacts to their work effort associated with an Owner directive to alter the sequence of construction.  (Ex. A at ¶ 32).

31.     As part of its claim against USFIC, Attard seeks recovery of $914,698 for Change Notice (CN) 489 (the "Re-Sequencing Claim"). (Ex. C-1 at 3).

32.     As of the date of filing this Motion, the Owner has not executed a change order recognizing a right to payment for CN 489, and has not issued any payment on CN 489.  (Ex. A at ¶ 33).

33.     Attard's claims related to certain of its change order work have settled with the Owner for amounts less than what Attard presently seeks.  The following chart lists the amount Attard is claiming on particular change orders, as well as the pro-rated amount that is due for Attard's portion of the work associated with each change:

| <u>A</u><br><br>PCO Number | <u>B</u><br><br>Total Amount Attard Claims Is Owed | <u>C</u><br>Attard's Pro-Rata Share of the Amount The Owner Approved |
|---|---|---|
| 1566 | $44,733 | $38,000 |
| 1529 | $12,016 | $11,000 |
| 1654 | $6,335 | $5,600 |
| 1345 | $52,887 | $45,000 |
| 1243 | $15,570 | $14,500 |

| | | |
|---|---|---|
| 1149 (CN 331) | $1,667,485 | $828,181 |
| 1848 | $14,375 | $12,300 |
| 2123 | $58,272 | $49,531 |
| 1953 | $26,671 | $21,604 |
| 2118 | $11,695 | $9,300 |
| 2060 | $28,578 | $16,261 |
| 2067 | $71,509 | $54,776 |
| UP 131 | $17,859 | $12,565 |
| 2021 | $44,412 | $43,524 |
| UP 136 | $30,530 | $14,135 |
| 2370 | $18,677 | $18,341 |
| 2108 | $75,000 | $71,239 |
| **TOTAL:** | **$2,196,604** | **$1,265,857** |

(Ex. A at ¶ 15-17; Ex. C-1 at 2-3).

34.     Attard also seeks $345,822 for its claim associated with PCO 1839.  (Ex. C-1 at 3).

35.     The Owner drastically reduced the scope of the sheetmetal work required on PCO 1839 after Attard's termination.  The reduction in scope is reflected in my adjustment to Attard's August 27, 2007 proposal. (Ex. A at ¶ 19, Ex. A-8).

36.     Based on the reduction in scope $97,923.00 was submitted for sheetmetal work on PCO 1839.  (Ex. A at ¶ 20, A-8).

9

37.     Jett's proposal for all trades for PCO 1839 was $179,786.14. (Ex. A at ¶ 21, Ex. A-8 at 1).

38.     As reflected in Jett's Application and Certification for Payment, Application number 70, Jett settled the entirety of PCO 1839 also referred to as CN 711 for $88,750.00. This settlement was 49% of Jett's proposal. (Ex. A ¶ at 22; Ex. A-9).

39.     The pro-rata sheetmetal portion of the Owner's settlement on the reduced scope for PCO 1839 amounted to $48,339. (Ex. A at ¶ 23).

40.     Attard performed 90% of the sheetmetal work required on PCO 1839. (Ex. A at ¶ 24).

41.     A pro-rata distribution of the sheetmetal portion of PCO 1839 for the work Attard performed for this PCO would amount to $43,505.10.

42.     Based upon the parties' dealings during the Project, Jett understood that it and Attard would resolve compensation issues between them involving Owner settlements of change orders by distributing to Attard a pro-rated portion of the amount approved by the Owner for each change order.  The parties followed this practice on approximately 42 change orders during the Project totaling $1,133,452, for which there is presently no dispute as to payment.  (Ex. A at ¶ 34).

43.     Attard also understood that it would receive a pro-rata distribution of proceeds from any amount approved by the Owner on any given change order. (Ex. C-2, Brian Attard Dep. Tr. 149:21-22, 150:1-20).

**D.     Assignment of the Sub-subcontract by Attard**

44.     In a March 18, 2003 commitment letter from Southern Financial Bank[1] Attard agreed that a condition of its line of credit with the Bank was an "[e]xecuted assignment of contract rights." (Ex. B-2, March 18, 2003 Commitment Letter, at 2).

45.     On April 16, 2003, the Bank forwarded a Notice of Assignment of Claims Under Contract that Jett signed and returned to the Bank. The Notice states that monies due or to become due under the contract are assigned to the Bank. (Ex. A-3, April 16, 2003).

46.     The May 2, 2003 Promissory Note between Attard and the Bank lists an "Assignment of Contracts" as collateral. (Ex. B-3, May 2, 2003 Promissory Note at 2).

47.     In response to USFIC's First Set of Requests for Production of Documents, Attard stated that the Bank "has received an assignment or a partial assignment of some of Attard's claims in this matter." (Ex. C-3, Attard's Answers and Objections to USFIC's First Request for Production of Documents at 1).

48.     Neither Attard nor the Bank have produced the assignment agreement.

**E.     Attard's Action Against Jett in Virginia State Court**.

49.     On February 22, 2010, after Attard instituted this suit against USFIC, Attard instituted a separate action directly against Jett and Orange Sheetmetal, LLC ("Orange") in the Circuit Court of Loudoun County, Virginia, styled Attard Industries, Inc. v. Jett Mechanical, Inc., et al, case number CL 60207, seeking recovery, in part, for the very same damages asserted here. (Ex. C-4, Attard's Circuit Court Complaint).

50.     USFIC was not a named party to Attard's Loudoun County Circuit Court action.

---

[1] Subsequently, upon information and belief, Southern Financial Bank merged or was acquired by Provident Bank which merged or was acquired by M&T Bank, the current holder of the assignment. Southern Financial Bank and it successors will be referred to collectively as the "Bank."

51.     On March 3, 2010, because Attard did not add Jett to this suit, USFIC demanded that Attard do so within 30 days, pursuant its rights under Virginia Code § 49-25, *et seq.* (Ex. C-5, March 3, 2010 letter).

52.     On March 25, 2010, Attard propounded discovery in its state court action by issuing its First Set of Interrogatories to Jett and Orange Sheetmetal, LLC. (Ex. C-6, Attard's First Set of Interrogatories to Jett and Orange Sheetmetal).

53.     On April 2, 2010, Attard responded to USFIC's letter dated March 3, 2010, and stated that it would not add Jett to this action.  (Ex. C-7, April 2, 2010 Letter).

54.     Attard has not propounded further discovery in the state court action since March 25, 2010. (Ex. C, Affidavit of Fred A. Mendicino at ¶ 5).

55.     As of the date of this Motion, no trial date has been set in the Loudoun County Circuit Court action. (Ex. C at ¶ 6).

## II.     GOOD FAITH CONFERRAL CERTIFICATION

Pursuant to Local Civil Rule 7(E), the undersigned certifies that counsel for USFIC and counsel for Attard discussed USFIC's Motion by telephone on Wednesday, July 28, 2010, to confer in good faith. (Ex. 19, the Parties' Emails). The parties, however, could not reach an agreement on the disputed issues which are the subject of USFIC's Motion.

## III.     LEGAL STANDARD

Summary judgment should be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2).  Facts are "material" when they might affect the outcome of the case, and a "genuine issue" exists when the evidence would allow a reasonable jury to return a verdict for the non-moving party. *See*

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). The moving party is "entitled to judgment as a matter of law" when the non-moving party fails to make an adequate showing on an essential element for which it has the burden of proof at trial. *See Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 804, 119 S. Ct. 1597, 143 L. Ed. 2d 966 (1999). To overcome a motion for summary judgment, the non-moving party "may not rely merely on allegations or denials in its own pleading" but must "set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e).

## IV.    ARGUMENT

### A.    Attard Is Not Entitled to Compensation For Certain of Its Claims Under the Express Language of the Sub-subcontract.

It is well settled under Virginia law that a surety and its principal are in privity with one another, and therefore a surety defending a bond claim is entitled to assert its principal's rights and defenses. *Blumenthal-Kahn Elec. Ltd. v. American Home Assur. Co.*, 236 F.Supp.2d 575, 583 (E.D.Va. 2002) (if a surety is not entitled to invoke the rights and privileges of its principal, then those rights are "rendered meaningless" (internal citation omitted)); *see Centex Construction v. Acstar Insurance, Co.*, 448 F.Supp.2d 697, 714 (E.D.Va. 2006) (a surety may step into the shoes of its principal and "the defenses available to both may be asserted by either," *citing Board of Supervisors of Fairfax County v. Southern Cross Coal Corp.*, 238 Va. 91, 380 S.E.2d 636 (1989)).

The rights and defenses of USFIC's principal, Jett, are set forth in the Sub-subcontract between Jett and Attard. Under Virginia law, the parties' Sub-subcontract is the law of the case and must be enforced unless the Sub-subcontract is repugnant to public policy or law. *D.C. McLain v. Arlington County*, 249 Va. 131, 135, 452 S.E.2d 659, 662 (1995). Therefore, USFIC,

as surety, is entitled to enforce the rights and defenses set forth in its principal's Sub-subcontract

with Attard.

### 1. Attard's Claims for CN 489 and the Period 3 Delay are Not Ripe under Article 5.1 of the Sub-subcontract.

Attard's claim for CN 489 and the Period 3 Delay are not ripe under Article 5.1 of the

Sub-subcontract because the Owner has not recognized them as compensable claims.  Article 5.1

states:

> If the Sub-subcontractor [Attard] shall make any claim for additional compensation and/or time for Owner directed changes in the work, or any other damages for any cause arising out of or relating to problems caused by or which are the responsibility of the Owner, *a decision of the Owner or the Owner's authorized representative shall be final and binding upon the Sub-subcontractor to the same extent that it is final and binding on Subcontractor* [Jett].

(Ex. A-2, Article 5.1; emphasis added).  A decision by the Owner is required under Article V of

Jett's Subcontract with Turner before Jett is entitled to any payment for any change order

associated with delay, obstruction, hindrance or interference with the work.  (Ex. A-1, Article V).

The Sub-subcontract incorporates this requirement and makes it binding upon Attard.  (Ex.A-2,

Article 2.1).

Attard's claims for payment for CN 489 and the Period 3 Delay are undoubtedly claims

for additional compensation which are the responsibility of the Owner.  (Ex. A at ¶¶ 30 and 32).

CN 489 is a proposed change order for re-sequencing of work that was directed by the Owner.

(Ex. A at ¶ 32).   It is intended to compensate the contractors on the Project for the costs

associated with the impacts to and interference with their work associated with the re-sequencing

directed by the Owner.  (Ex. A at ¶ 32).  The Period 3 Delay is a proposed change based on

project delays for which the contractors on the Project likewise believe the Owner is responsible.

(Ex. A at ¶ 30; Ex. B-1, McManus Dep. Tr. 91:4-11, 93:9-22, 94:1-17).  Therefore, Attard's

14

claim to payment on CN 489 and the Period 3 Delay are covered under Article 5.1 of the Sub-subcontract and Article V of the Subcontract.

Because these claims fall within the scope of Article 5.1 and Article V, Attard's right to payment is subject to a "decision of the Owner or the Owner's authorized representative." (Ex. A-2, Article 5.1). The Owner has not yet made a decision or otherwise recognized any right to payment for Jett or Attard regarding CN 489 and the Period 3 Delay. In fact, the Owner may ultimately decide to deny any right to payment for these claims. Attard's claim that it is entitled to approximately $2.7 million dollars for CN 489 and the Period 3 Delay are therefore premature and should be dismissed.

### 2. Attard's Period 3 Delay Claim is Barred by Article 4.1.9.

Additionally, Attard's claim for the Period 3 Delay is not ripe under the Sub-subcontract's no-damages-for-delay clause. Article 4.1.9 of the Sub-subcontract provides that Attard's exclusive remedy for Owner-caused delays is an extension of time, unless and until Jett recovers compensation for same. Article 4.1.9 of the Sub-subcontract states:

> Subcontractor [Jett] shall not be liable to the Sub-Subcontractor [Attard] for any damage or additional compensation as a consequence of delays … caused by any person unless, as a condition precedent, the Subcontractor has first recovered same from the party responsible for the delays. Sub-subcontractor understands and agrees that apart from any recovery from the delaying party, the Sub-subcontractor's sole and exclusive remedy for the delay shall be an extension in the time for performance of the Sub-Subcontractor's work.

(Ex. A-2, Article 4.1.9).

This Court has held that no-damages-for-delay clauses are valid and enforceable. *McDevitt & Street Co. v. Marriott Corp.*, 713 F. Supp. 906, 921 (E.D. Va. 1989) (enforcing a no-damages-for-delay clause that states, "Owner … shall not be held responsible for any loss or damage sustained by Contractor … through delay caused by Owner … and Contractor agrees not

to make, and hereby waives, any claim for damages, and agrees that the sole right and remedy therefor shall be an extension of time."). Furthermore, the Fourth Circuit has specifically recognized the right of a surety to enforce a no-damages-for-delay clause contained in its principal's contract with a bond claimant as a defense to a payment bond claim for delay damages. *Dennis Stubbs Plumbing, Inc. v. Travelers Cas. & Sur. Co. of Am.*, 67 Fed. Appx. 789, 2003 WL 21305789, at *1   (4th Cir. 2003); *U.S. ex. Rel. Joseph Shisko, Inc. v. Metric Constructions*, Case No. 98-1042 1998 U.S. App. Lexis 31621, at *2 (4th Cir. 1998) (affirming the district court's holding allowing a surety to avail itself of the no damages-for-delay clause contained in its principal's contract with the bond claimant) (per curiam); *see also Nova Cas. Co. v. Liberty Mut. Ins. Co.*, 540 F. Supp. 2d 476, 483 (S.D.N.Y 2008) (delay claims against surety barred by the no-damages-for-delay clause contained in the surety's principal's subcontract).

In fact, this Court permitted a surety to enforce a no-damages-for-delay provision with language almost identical to the provision at issue in this case. In *U.S. ex. Rel. Zanahary Group, Inc. v. Systems Eng'g and Energy Mgmt. Assocs., Inc.*, a subcontractor sued a general contractor and its surety, in part, for delay damages. Case No. 2:98cv1431, 2000 U.S. Dist. Lexis 23003, at *1 (E.D.Va. 2000). The general contractor and the surety filed a motion to dismiss the subcontractor's delay claim, based on the contract's no-damages-for-delay provision. That provision stated:

> If the process of the Subcontractor's work is substantially delayed without the fault or responsibility of the Subcontractor, then the time for the Subcontractor's work shall be extended to the extent obtained by SEEMA [the general contractor] under the Prime Contract and the schedule of work shall be revised accordingly. SEEMA shall not be liable to the Subcontractor for any damages or additional compensation as a consequence of delays caused by any person not a party to this Subcontract ***unless SEEMA has first recovered the same on behalf of the Subcontractor from said person***, it being understood and agreed by the Subcontractor that, apart from recovery from said person, ***the Subcontractor's sole and exclusive remedy for delay shall be an extension in the time for***

**performance of the Subcontractor's work.**

*Id.* at 12 (emphasis added). The Court granted the parties' motion to dismiss because under the no-damages-for-delay provision, the subcontractor did not have a right to delay damages when the general contractor had not recovered them from the Owner. *Id.*

Likewise, the Court should permit USFIC to enforce the Sub-subcontract's no-damages-for-delay provision, which uses almost the exact same language as the provision in *Zanahary*. Article 4.1.9 provides that Jett shall not be liable for damages or compensation due to delays, "unless, as a condition precedent, the Subcontractor [Jett] has first recovered same from the party responsible for the delays." (Ex. A-2, Article 4.1.9). This language is nearly identical to the wording used in the no-damages-for-delay clause in *Zanahary*. Also, similar to the language used in *Zanahary*, Article 4.1.9 provides that, "the Sub-Subcontractor's sole and exclusive remedy for delay shall be an extension in the time for performance of the Sub-Subcontractor's work."

In Attard's Supplemental Answers to USFIC's First Set of Interrogatories, Attard asserts a claim of $1,733,035.00 for the Period 3 Delay. (Ex. C-1 at 3). The Period 3 Delay is obviously a delay claim and subject to Article 4.1.9 of the Sub-subcontract. To date, the Owner has not recognized, and Jett has not been paid for, the Period 3 Delay. (Ex. A at ¶ 31). Just as was the case in *Zanahary*, because Jett and USFIC have not yet received any delay damages regarding the Period 3 Delay, Attard's sole and exclusive remedy is an extension of time, pursuant to Article 4.1.9. Thus, the Court should rule as it did in *Zanahary* and deny Attard recovery of delay damages for the Period 3 Delay.

> **3. Attard's Claim for Compensation for the Period 3 Delay Should be Dismissed because Attard was not Performing Work on the Project During the Compensable Period.**

Attard is not entitled to compensation for the Period 3 Delay because it relates to contractor expenses for a period after Attard was terminated. The Period 3 Delay is a delay claim by all the contractors on the Project for their additional costs associated with the extended duration of the Project subsequent to the Period 2 Extension.. (Ex. A at ¶ 30; Ex. B-1, McManus Dep. Tr. 91:4-11, 93:9-22, 94:1-17).   The Period 2 Extension established a new substantial completion date of approximately July 2008. (Ex. A at ¶ 29; Ex. B-1, McManus Dep. Tr. 90:5-22, 93:2-8).   Because Attard was terminated for default on June 20, 2008, it did not incur any costs on the Project after August 18, 2008, and therefore should not have a claim for the Period 3 Delay. (Ex. A-5).

Under Virginia law, recoverable delay damages are limited to "the direct cost of all labor and material ... *plus fair and reasonable overhead expenses* properly chargeable ... during the reasonable time required to complete performance." *Fairfax County Redevelopment and Housing Authority v. Worcester Brothers Co., Inc.* 257 Va. 382, 388 514 S.E.2d 147, 151 (1999) (*quoting E.I DuPont deNemours & Co. v. Universal Moulded Prod.*, 191 Va. 528, 581, 62 S.E.2d 233, 259 (1950) (emphasis in the original)).   Attard did not incur <u>any</u> costs during the time frame required to complete performance covered by the Period 3 Delay. This is because it was terminated from the Project on June 20, 2008, one month before the start of the time frame associated with the Period 3 Delay. Accordingly, Attard's claim for compensation for the Period 3 Delay cannot meet the requirements of Virginia law and should be dismissed. *Worcester Brothers*, 257 Va. at 388, 514 S.E.2d at 151.

### 4. The Owner's Decision on Change Order Compensation Is Binding on Attard.

The Sub-subcontract expressly provides that Attard's right to payment, if any, for Owner directed change order work is limited to its share of what the Owner approved for those changes.

Article 5.1 of the Sub-subcontract bars Attard from recovering compensation beyond what the Owner finally approved for Attard's scope of work on any particular change order. Article 5.1 provides, "If Sub-subcontractor [Attard] shall make any claim for ... Owner directed changes in the Work ... a decision of [sic] Owner ... shall be final and binding upon Sub-subcontractor to the same extent it is final and binding on Subcontractor [Jett].") (Ex. A-2, Article 5.1).  The purpose of Article 5.1 is plainly to preclude an endless morass of disputes over the compensation to be paid to Attard each time the Owner decides to proceed with a change to the work. Consequently, Article 5.1 makes Attard's right to payment expressly subject to any decision of the Owner including the issuance of change orders. Therefore, to the extent the Owner issued a change order for work performed by Attard, Attard can only recover its share of the amount finally authorized and paid to Jett by the Owner on that claim. (Ex. A-2, Article 5.1).

This was, in fact, the practice of Jett and Attard during the Project.  Jett understood that it would pay Attard for its portion of settled changes by distributing to it a pro-rata portion of change order proceeds.  (Ex. A at ¶ 34).  There were numerous changes issued by the Owner on this job that were fully resolved between Jett and Attard through the payment of a pro-rata distribution of change order settlement funds by Jett to Attard.  (*Id.*).  Moreover, Attard concedes that its right to payment for these claims is dependent upon amounts ultimately approved by the Owner.  The President of Attard, Mr. Brian Attard, addressed this subject in his deposition:

Q.    Well, let's say you've invoiced at $50,000 and the owner agrees to pay $25,000, then what happens?  Are you still due the $50,000?

**A.    Well, no.**

Q.    What would you be due?

**A.    We'd be due the $25,000, if there was decent explanation for it.**

Q.    And did that process occur on this job where you would invoice a set amount for a

19

particular change and then subsequently that change would be negotiated with the owner, Turner, Jett, perhaps others?  Did that happen?

**A.     Yes.**

Q.      And then were there times when settlement was less than what you had invoiced for?

**A.     Yes.**

Q.      And was it your understanding you would be paid a proportionate share of the settlement?

**A.     Yes.**

(Ex. C-2, Brian Attard Dep. Tr. 149:21-22, 150:1-20; emphasis in the original).

The following chart summarizes what Attard claims it is owed for its work on certain change orders.  Colum A identifies the Proposed Change Order (PCO) number, and Column B itemizes the amount Attard claims it is owed for that particular PCO:

| **A**<br>**PCO Number** | **B**<br>**Total Amount Attard Claims Is Owed** |
|---|---|
| 1566 | $44,733 |
| 1529 | $12,016 |
| 1654 | $6,335 |
| 1345 | $52,887 |
| 1243 | $15,570 |
| 1149<br><br>(CN 331) | $1,667,485 |
| 1848 | $14,375 |
| 2123 | $58,272 |

20

| | |
|---|---|
| 1953 | $26,671 |
| 2118 | $11,695 |
| 2060 | $28,578 |
| 2067 | $71,509 |
| UP 131 | $17,859 |
| 2021 | $44,412 |
| UP 136 | $30,530 |
| 2370 | $18,677 |
| 2108 | $75,000 |
| **TOTAL:** | **$2,196,604** |

(Ex. C-1 at 2-3).

However, Attard's share of the amounts approved and paid by the Owner on each change order is substantially less than the amount claimed by Attard.  (Ex. A at ¶ 15-17).  Column C has been added to the summary above to show Attard's share of the amount the Owner <u>approved</u> for each PCO:

| <u>A</u><br><br>PCO Number | <u>B</u><br><br>Total Amount Attard Claims Is Owed | <u>C</u><br>Attard's Pro-Rata Share of the Amount The Owner Approved |
|---|---|---|
| 1566 | $44,733 | $38,000 |
| 1529 | $12,016 | $11,000 |
| 1654 | $6,335 | $5,600 |

| 1345 | $52,887 | $45,000 |
|---|---|---|
| 1243 | $15,570 | $14,500 |
| 1149 (CN 331) | $1,667,485 | $828,181 |
| 1848 | $14,375 | $12,300 |
| 2123 | $58,272 | $49,531 |
| 1953 | $26,671 | $21,604 |
| 2118 | $11,695 | $9,300 |
| 2060 | $28,578 | $16,261 |
| 2067 | $71,509 | $54,776 |
| UP 131 | $17,859 | $12,565 |
| 2021 | $44,412 | $43,524 |
| UP 136 | $30,530 | $14,135 |
| 2370 | $18,677 | $18,341 |
| 2108 | $75,000 | $71,239 |
| **TOTAL:** | **$2,196,604** | **$1,265,857** |

(Ex. 1 at ¶ 15; Ex. C-1 at 2-3).

Under Article 5.1 of the Sub-subcontract, the decision of the Owner regarding amounts owed on these particular change orders is binding on Attard. This is, in fact, how the parties operated during the Project. (Ex. A at ¶ 34). Because Jett was only entitled to recover $1,265,857 for Attard's portion of the change orders listed in the above summary, Attard's right to payment, if any, is limited to this amount. Column D

22

below represents the amount Attard is barred from recovering for these PCO's based upon the reduced change order amount authorized by the Owner.

| **A**<br><br>PCO Number | **B**<br><br>Total Amount Attard Claims Is Owed | **C**<br><br>Attard's Share of the Amount The Owner Approved | **D**<br><br>Amount Attard Is Not Entitled To Recover Based on Article 5.1 |
|---|---|---|---|
| 1566 | $44,733 | $38,000 | $6,733 |
| 1529 | $12,016 | $11,000 | $1,016 |
| 1654 | $6,335 | $5,600 | $735 |
| 1345 | $52,887 | $45,000 | $7,887 |
| 1243 | $15,570 | $14,500 | $1,070 |
| 1149 (CN 331) | $1,667,485 | $828,181 | $839,304 |
| 1848 | $14,375 | $12,300 | $2,075 |
| 2123 | $58,272 | $49,531 | $8,741 |
| 1953 | $26,671 | $21,604 | $5,067 |
| 2118 | $11,695 | $9,300 | $2,395 |
| 2060 | $28,578 | $16,261 | $12,317 |
| 2067 | $71,509 | $54,776 | $16,733 |
| UP 131 | $17,859 | $12,565 | $5,294 |
| 2021 | $44,412 | $43,524 | $888 |
| UP 136 | $30,530 | $14,135 | $16,395 |

| 2370 | $18,677 | $18,341 | $336 |
| 2108 | $75,000 | $71,239 | $3,761 |
| **TOTAL:** | **$2,196,604** | **$1,265,857** | **$930,747** |

Further, Attard claims $345,822 for its work on PCO 1839. (Ex. C-1 at 3). However, the Owner drastically reduced the scope of the sheetmetal work required on PCO 1839 after Attard's termination. (Ex. A at ¶ 19). After the Owner reduced Attard's scope, the work Attard performed on PCO 1839 amounted to 90% of the total work required on that change order. (Ex. A at ¶ 24). The sheetmetal portion of the Owner's settlement on PCO 1839 amounted to $48,339. (Ex. A at ¶ 20-23). Under Article 5.1 of the Sub-subcontract, Attard is only entitled to 90% of $48,339, which amounts to $43,505.10. (Ex. A-2, Article 5.1). Therefore, by claiming $345,822 Attard overstates its right to payment on PCO 1839 by $302,316.90.

Therefore, USFIC is entitled to summary judgment as a matter of law reducing Attard's claim by $1,233,063.00, which represents the difference between the amount claimed by Attard on the above-referenced PCO's and the pro-rata portions of each claim due Attard on the amounts ultimately approved by the Owner.

**B.     Attard Lacks Standing**

Attard does not have the required standing to maintain its payment bond claim against USFIC because it appears to have assigned all of its rights in the Sub-subcontract to the Bank and its successors. "It is well settled that in order to entitle any person to maintain an action in court it must be shown that he has a justiciable interest in the subject matter in litigation..." *Lynchburg Traffic Bureau v. Norfolk and Western Railway Co.*, 207 Va. 107, 108 (1966) (quotation marks omitted). Attard lacks this justiciable interest because it apparently assigned its

24

contract with Jett to the Bank, and an assignor of a contract divests himself of the right to bring a claim on the assigned contract. *Nigh v. Koons Buick Pontiac, GMC, Inc.*, No. CIVA 00-1634-A, 2001 WL 35963875, at \*4 (E.D.Va. Aug. 15, 2001) (*rev'd on other grounds*) ("[a]n assignor, to the extent it has divested itself of ownership or title, loses all right to enforce a claim on an assigned contract."). *See also Sweeney v. Foster,* 112 Va. 499, 507 (1911) (Defendant's demurrer to the claim proper where plaintiff's "assignment of the contract was absolute, and carried with it all right, title, and interest he had in and to any benefits under the contract…").

In a March 18, 2003 commitment letter from the Bank, Attard agreed that a condition of its line of credit with the Bank was an "[e]xecuted assignment of contract rights." (Ex. B-2 at 2). Less than one month later, the Bank forwarded a Notice of Assignment of Claims Under Contract ("Notice") to Jett. (Ex. A-3). In the Notice, the bank indicates that "Monies due or to become due under the contract described above have been assigned to SOUTHERN FINANCIAL BANK."[2] (*Id.*). The assigned contract is described as the "Dulles Airport Package 6 @ Dulles Airport, Main Terminal People Mover Station." (*Id.*).

Attard's assignment of the contract is further demonstrated by the May 2, 2003 Promissory Note between Attard and the Bank (the "Note"). In the Note, an "Assignment of Contracts" by Attard is returned as collateral. (Ex. B-3 at 2). Attard even admits in its response to USFIC's First Set of Requests for Production that it assigned the contract, at least partially, to the Bank. Attard states that the Bank "has received an assignment, or partial assignment, of

---

[2] The Notice states that the assignment is pursuant to 31 U.S.C. 3727 and 41 U.S.C. 15. Both of these code sections allow a bank to be assigned contracts and claims against the U.S. government.

some of Attard's claims in this matter."[3]   (Ex. C-1 at 1).   Attard's Assignment of its Sub-subcontract divests it of the ability to pursue claims. *Nigh*, 2001 WL 35963875, at *4; *Sweeney,* 112 Va. at 507. Therefore, Attard's claim should be dismissed and summary judgment granted to USFIC.

### C.   <u>Attard Fails to Comply with the Virginia Code.</u>

Under the Virginia Code, if requested by the surety, a claimant on a bond is required to sue the bond principal within 30 days of receiving the surety's written demand.  Section 49-25 states, "The surety ... of any person bound by any contract may, if a right of action has accrued thereon, require the creditor ... by notice in writing, to institute suit thereon ...." Va. Code § 49-25 (West 2010).  If the claimant fails to add the bond principal, then the claimant forfeits its right to payment.  Section 49-26 provides:

> If such creditor ... shall not, within thirty days after such requirement, institute suit against every party to such contract who is resident in this Commonwealth and not insolvent and prosecute the same with due diligence to judgment and by execution... he shall forfeit his right to demand of such surety ... the money due by any such contract for the payment of money ....

Va. Code § 49-26 (West 2010).

On March 3, 2010, USFIC demanded that Attard add Jett, USFIC's principal, to this suit under Virginia Code § 49-25.  (Ex. C-5). On April 2, 2010, Attard refused. (Ex. C-7). Instead, Attard has pursued a separate state court action against Jett in Loudoun County Circuit Court. (Ex. C-4).

Since suing Jett in state court in February 2010, Attard has let its state court case largely sit idle. Attard last propounded discovery in the state court action on March 25, 2010.  (Ex. C-6 at ¶ 4). There is also no trial date for the state court action and it will likely not be heard until

---

[3] USFIC has requested that Attard produce its assignment to the bank, but has not received a copy and Attard now contend that it does not have one.

2011. (Ex. C at ¶ 6). Attard's actions run-afoul of the purpose behind Virginia Code § 49-25, *et seq.*

When interpreting a statute, "the primary objective ... is to ascertain and give effect to legislative intent." *Viking Enterprise, Inc. v. County of Chesterfield*, 277 Va. 104, 110, 670 S.E.2d 741, 744 (2009). Under Virginia law, courts must interpret a statute "so that the purpose of the enactment will not be limited or defeated, but instead will be promoted." *Dowdy v. Franklin*, 203 Va. 7, 10, 121 S.E.2d 817, 819 (1961) (internal citation omitted). The obvious purpose of Virginia Code § 49-25, *et. seq.*, is clear: to provide the surety, the secondary obligor, with an opportunity to obtain exoneration from liability for a claim by its principal, the primary obligor, in advance of incurring that liability itself. It is equally obvious that Attard has avoided prosecuting its claims against Jett and only filed its state court action in the hope that this Court will find that it has satisfied Virginia Code § 49-25, *et. seq.* Attard's motive is transparent and Attard should not be permitted to end-run its statutory obligations and subvert USFIC's statutory rights.

Attard's failure to add Jett to this suit runs contrary to the clear intent of Virginia Code § 49-25, *et. seq.*, because Attard will try its suit against USFIC long before any trial against USFIC's principal, Jett, occurs.[4]   The Court is obligated to make sure that the purpose of Virginia Code § 49-25, *et. seq.*, is not defeated and that the statute's clear intent is enforced. *Viking Enterprise*, 277 Va. at 110, 670 S.E.2d at 744; *Dowdy*, 203 Va. at 10, 121 S.E.2d at 819. Because the purpose of Virginia Code § 49-25, *et seq.*, is to ensure that Attard seeks judgment against Jett, USFIC's principal, first, so as to exonerate it from this claim, the Court should grant USFIC's Motion for Summary Judgment and dismiss Attard's claims against USFIC.

---

[4] Trial in this case is set to begin on August 23, 2010, whereas no trial date has been set in Attard's state court action. (Doc. No. 63; Ex. C at ¶ 5).

27

## V.    CONCLUSION

Based on the foregoing, Defendant United States Fire Insurance Company respectfully requests that this Court grant its Motion for Summary Judgment against Plaintiff Attard Industries, Inc. and dismiss this suit because:

(1)  Attard does not have standing to bring this action; and/or

(2)  Attard has forfeited its right to recover against USFIC under Virginia Code § 49-25, *et seq.*

Alternatively, Defendant United States Fire Insurance Company respectfully requests that this Court grant its Motion for Partial Summary Judgment against Plaintiff Attard Industries, Inc. and dismiss its claim for:

(1)  $2,647,733 related to CN 489 and the Period 3 Delay which are not ripe; and/or

(2)  $1,733.035 related to the Period 3 Delay under the Sub-subcontract's no-damages-for-delay provision; and/or

(3)  $1,733.035 related to the Period 3 Delay for not being on the job during the compensable period; and/or

(4)  $1,233,063.00 representing the difference between the amount claimed by Attard on the above-referenced PCO's and the amounts ultimately approved by the Owner.

Date:  July 28, 2010                              Respectfully submitted,

                                                 **UNITED STATES FIRE INSURANCE COMPANY**

                                                 By counsel,

                                                 _____/s/_____
                                                 Fred A. Mendicino (VSB No.: 34474)
                                                 Attorney for United States Fire Insurance Company
                                                 SEEGER FAUGHNAN MENDICINO, P.C.
                                                 21355 Ridgetop Circle, Suite 110

Dulles, Virginia 20166
Tel.:   (571) 434-7590
Fax.:   (571) 434-9006
Email: mendicino@sfmlawfirm.com


_____/s/_____
Seth A. Robbins  (VSB No.: 45807)
Attorney for United States Fire Insurance Company
SEEGER FAUGHNAN MENDICINO, P.C.
2620 P Street, N.W.
Washington, D.C. 20007
Tel.: (202) 822-8838
Fax.: (202) 822-6982
Email: robbins@sfmlawfirm.com

29

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing was electronically filed on July 28, 2010, and sent to:

> David Hilton Wise (VSB # 30828)
> James P. Lukes (VSB # 73752)
> Attorneys for Attard Industries, Inc.
> WISE LAW, PLC
> 11325 Random Hills Rd
> Suite 350
> Fairfax, Virginia 22030
> dwise@wiselawplc.com
> jlukes@wiselawplc.com

> _____/s/_____
> Seth A. Robbins  (VSB No.: 45807)
> Attorney for United States Fire Insurance Company
> SEEGER FAUGHNAN MENDICINO, P.C.
> 2620 P Street, N.W.
> Washington, D.C. 20007
> Tel.: (202) 822-8838
> Fax.: (202) 822-6982
> Email: robbins@sfmlawfirm.com